United States Courts
Southern District of Texas
ENTERED

FEB 2 3 2005

Michael N. Milby, Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

IN RE RELIANT SECURITIES      §
LITIGATION                    §   MASTER FILE NO. H-02-1810
                              §

_____

## MEMORANDUM OPINION AND ORDER CERTIFYING CLASS

Pending is Lead Plaintiffs' Motion for Class Certification (Document No. 107), in which Plaintiffs seek an Order certifying the Louisiana Municipal Employees' Retirement System ("MPERS")[1] as the class representative of the following class: All persons or entities, with certain noted exclusions, "who purchased common shares of Reliant Resources in the initial public offering on April 30, 2001 or traceable thereto, pursuant to the Reliant Resources Registration Statement and Prospectus dated April 30, 2001." Having considered the motion and memorandum in support, Defendants' response in opposition to class certification (Document No. 113),[2]

_____

[1] Louisiana Municipal Police Employees' Retirement System ("MPERS"), the Louisiana School Employees' Retirement Systems ("LSERS"), and the Boca Raton Police & Firefighters Retirement System ("Boca Raton P&F") were designated as Lead Plaintiffs in this case. MPERS, however, is the only one of the three Lead Plaintiffs to have purchased Reliant Resources stock in the Initial Public Offering. Therefore, only MPERS seeks certification as the representative of the class at issue in the Motion for Class Certification.

[2] The Reliant Defendants consist of CenterPoint Energy, Inc. (formerly known as Reliant Energy, Inc.), Reliant Energy, Inc. (formerly known as Reliant Resources, Inc.), R. Steve Letbetter, Stephen W. Naeve, and Mary Ricciardello. The other Defendants have

the parties' additional briefing (Document Nos. 117, 123, 124, 127), oral arguments presented in Court on February 16, 2005, and the applicable law, the Court concludes for the reasons set forth below that Lead Plaintiffs' Motion for Class Certification should be granted.

## I.   Parties and Claims

This case was originally brought as a class action by Lead Plaintiffs on behalf of themselves and three classes of investors. In a Memorandum Opinion and Order entered on January 16, 2004, Plaintiffs' claims related to all but one of the classes, the "Initial Public Offering (IPO) Class," were dismissed. *See* Document No. 96. Thus, only Plaintiffs' claims with respect to the IPO Class remain. Those claims, asserted against Reliant Resources, the Individual Defendants,[3] and the Lead Underwriter Defendants (identified as Goldman, Sachs & Co.; Credit Suisse First Boston Corp.; ABN AMRO Rothschild LLC; Banc of America Securities L.L.C.; Deutsche Banc Alex. Brown, Inc.; Merrill Lynch Pierce Fenner & Smith, Inc.; and UBS Warburg, L.L.C.) for violations of Section 11 of the Securities Act of 1933, 15 U.S.C. §§ 77k, (Count

---

not filed separate responses to the Motion for Class Certification, but have adopted the opposition of the Reliant Defendants. *See* Document Nos. 114-116.

[3] The "Individual Defendants" referred to herein are R. Steve Letbetter, Mary P. Ricciardello, and Stephen Naeve.

2

Five), against the Individual Defendants and Reliant Energy for violations of Section 15 of the Securities Act of 1933, 15 U.S.C. § 77o (Count Six), and against the Outside Auditors (identified as Deloitte & Touche, L.L.P.), for violations of Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k (Count Seven), are all generally based on alleged inaccuracies, false statements and omissions related to "round-trip" trading transactions contained in the Reliant Resources Registration Statement and Prospectus dated April 30, 2001.

## II.  Motion for Class Certification

Lead Plaintiffs seek to certify a class, pursuant to FED. R. CIV. P. 23, of:

> All persons or entities who purchased common shares of Reliant Resources in the initial public offering on April 30, 2001 or traceable thereto, pursuant to the Reliant Resources Registration Statement and Prospectus dated April 30, 2001.
>
> Excluded from the Class are Defendants Reliant Energy, Inc.; Reliant Resources; R. Steve Letbetter, Mary P. Ricciardello, Stephen W. Naeve, and Joe Bob Perkins ("Individual Defendants"); Deloitte & Touche, LLP; Goldman, Sachs & Co., Credit Suisse First Boston Corp., ABN AMRO Rothschild LLC, Banc of America Securities LLC, Deutsche Banc Alex. Brown, Inc., Merrill Lynch Pierce Fenner & Smith, Inc., and UBS Warburg LLC (collectively the "Lead Underwriter Defendants"), the officers and directors of Reliant Energy or its successor in interest and Reliant Resources, and members of the Individual Defendants' immediate families, any entity in which any of the Defendants has a controlling interest or is a parent or subsidiary of or is controlled by Reliant Energy, CenterPoint Energy or Reliant Resources, and the

3

officers, directors, affiliates, legal representatives, heirs, predecessors, successors and assigns of any of the excluded persons or entities.

(Document No. 107) at 1-2. According to Plaintiffs, all requirements for certification under Rule 23(a) are present with respect to the IPO class. First, Plaintiffs maintain that the members of proposed class, who purchased just under 60 million shares in Reliant Resources's initial public offering, would be so numerous that joinder of them on an individual basis would be impracticable. Second, Plaintiffs maintain that there are common issues of law and fact, including, without limitation, (a) whether the Registration Statement and Prospectus contained false and/or misleading statements, misrepresentations of material fact, and/or omissions of material fact, (b) whether the market price of Reliant Resources's stock was artificially inflated by virtue of the alleged misrepresentations and omissions in the Registration Statement and Prospectus, and (c) whether the Defendants are liable under Section 11 and/or Section 15 of the Securities Act. Third, Plaintiffs maintain that the claims of MPERS, the proposed class representative, are typical of, if not identical to, the claims of the other members of the proposed class. Fourth, Plaintiffs maintain that MPERS can and will fairly and adequately protect the interests of the proposed class. Plaintiffs also contend that the requirements are present for class certification under Rule

4

23(b)(3) in that common questions of law or fact predominate over any questions affecting only individual members, and that the proposed class action is superior to other available methods of adjudicating the claims.

In response to the Motion for Class Certification (Document No. 113), Defendants argue that the sizeable volume of short sales of Reliant's common shares served to create many "artificial shares" that, in turn, preclude Plaintiffs from demonstrating that many class members have Article III standing to sue for the alleged violations of Section 11 and Section 15. Additionally, Defendants argue that the proof required to identify the "artificial shares" that are the by-product of short sales and from that, to eliminate those shareholders who do not have statutory standing, would result in individual issues predominating over issues common to the whole class. The entirety of Defendants' opposition to the Motion for Class Certification is premised on the effect that short sales would have in identifying those members of the proposed class who would be entitled to recover damages.

In its Reply to Defendants' Opposition (Document No. 117), Plaintiffs argue that MPERS, the proposed class representative, purchased shares of Reliant Resources pursuant to Reliant Resources's Registration Statement and Prospectus during Reliant Resources's initial public offering and that MPERS therefore has Article III standing to assert claims under Section 11 and

5

Section 15.    Additionally, Plaintiffs argue that there are no legitimate statutory standing issues with respect to individual class members who may have been parties to short sale transactions.[4]

### III.  Standard of Review

The requirements for certifying and maintaining the class action at issue in this case are set forth in FED. R. CIV. P. 23(a) and (b)(3).  "A district court must rigorously analyze Rule 23's prerequisites before certifying a class," Spence v. Glock, Ges.m.b.H., 227 F.3d 308, 310 (5th Cir. 2000), with "[t]he party seeking class certification [having] the burden of showing that the requirements for a class action have been met."  Applewhite v. Reichhold Chemicals, Inc., 67 F.3d 571, 573 (5th Cir. 1995).  At the same time, however, courts are given wide discretion in deciding certification issues.  Vizena v. Union Pacific R.R. Co., 360 F.3d 496, 502 (5th Cir. 2004); Berger v. Compaq Computer Corp., 257 F.3d 475, 478 (5th Cir. 2001).  As long as the court considers, and makes findings relative to, the requirements of Rule 23(a) and

---

[4] Plaintiffs in their written submission added that a simple solution to Defendants' sole articulated impediment to the certification of the proposed class would be "to simply exclude short sellers from the class--not deny class certification." Document No. 117 at 8. Plaintiffs did not urge this alternative in oral argument.

(b), a district court's decision regarding certification is afforded considerable deference. <u>Vizena</u>, 360 F.3d at 502-03.

In securities fraud cases, such as this, "when a court is in doubt as to whether or not to certify a class action, the court should err in favor of allowing the class to go forward." <u>In re Blech Sec. Litig.</u>, 187 F.R.D. 97, 102 (S.D.N.Y. 1999); *see also* <u>Eisenberg v. Gagnon</u>, 766 F.2d 770, 785 (3ᵈ Cir. 1985) ("'[T]he interests of justice require that in a doubtful case . . . any error, if there is to be one, should be committed in favor of allowing a class action.'") (quoting <u>Esplin v. Hirschi</u>, 402 F.2d 94, 101 (10th Cir. 1968), *cert. denied*, 89 S.Ct. 1194 (1969)), *cert. denied*, 106 S.Ct. 342 (1985).

## IV.  Discussion

Plaintiffs have asserted, on behalf of the IPO class, claims against the Reliant Defendants, the Individual Defendants, Deliotte & Touche, LLC, and the Underwriter Defendants under Section 11 of the Securities Act, 15 U.S.C. § 77k and control person liability against Reliant Energy and the Individual Defendants under Section 15 of the Securities Act, 15 U.S.C. § 77o.

## A.   Article III Standing[5]

The Article III standing arguments raised by Defendants do not preclude class certification.  In a class action case, Article III standing is determined by reference to the class representative, not the absent class members.  *See* <u>Lewis v. Casey</u>, 116 S.Ct. 2174, 2201-02 (1996) (Souter, J., concurring in part and dissenting in part)(once it is demonstrated that one class representative has Article III standing, "the standing doctrine has no further part to play"); *see also* <u>Prado-Steiman v. Bush</u>, 221 F.3d 1266, 1279 (11th Cir. 2000) ("prior to the certification of a class, and technically speaking before undertaking any formal typicality or commonality review, the district court must determine that at least one named class representative has Article III standing to raise each class subclaim"); <u>In re The Prudential Ins. Co. of Am. Sales Practices Litig.</u>, 148 F.3d 283, 306-07 (3rd Cir. 1998) ("'Once threshold individual standing by the class representative is met, a proper party to raise a particular issue is before the court, and there

---

[5] Article III standing is a jurisdictional prerequisite to maintaining suit: "The doctrine of standing asks whether a litigant is entitled to have a federal court resolve his grievance. This inquiry involves 'both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.'" <u>Kowalski v. Tesmer</u>, 125 S.Ct. 564, 567 (2004) (quoting <u>Warth v. Seldin</u>, 95 S.Ct. 2197, 2205 (1975). Article III standing is based on a showing that the conduct about which the plaintiff complains "has caused him to suffer an 'injury in fact' that a favorable judgment will redress." <u>Elk Grove Unified Sch. Dist. v. Newdow</u>, 124 S.Ct. 2301, 2308-09 (2004).

remains no further separate class standing requirement in the constitutional sense.'") (quoting 1 NEWBERG ON CLASS ACTIONS § 2.05 at 2-29 (3d Ed.1992)); <u>Vuyanich v. Republic Nat'l Bank of Dallas</u>, 82 F.R.D. 420, 428 (N.D. Tex. 1979) ("In a class action, then, the trial court initially must address whether the named plaintiffs have standing under Article III to assert their individual claims. If that initial test is met, the court must then scrutinize the putative class and its representatives to determine whether the relationship between them is such that under the requirements of Rule 23 the named plaintiffs may represent the class. The trial court generally need not address the final question of whether the class itself, after certification, has standing."); <u>In re VeriSign, Inc.</u>, 2005 WL 88969 at *4 (N.D. Ca. 2005) ("In the class action context, Article III standing simply requires that the class representatives satisfy standing individually."). Here, that means that if MPERS has standing to assert claims against Defendants under Section 11 and Section 15, then there is Article III standing to pursue the claims on behalf of the class as a whole.

The record shows that MPERS has standing to pursue claims under Section 11 and Section 15. A claim can be brought under Section 11 by "'any person acquiring' a security issued pursuant to a defective registration." <u>7547 Corp. v. Parker & Parsley Dev. Partners</u>, 38 F.3d 211, 223 (5th Cir. 1994). The phrase "any person acquiring such security" has been limited to "purchasers of shares

issued and sold pursuant to the challenged registration statement." Id. It also includes "anyone who can 'trace' his shares to the challenged registration statement (*i.e.,* not merely the initial purchasers)." Rosenzweig v. Azurix Corp., 332 F.3d 854, 873 (5th Cir. 2003). Plaintiffs' evidence is that MPERS purchased shares of Reliant Resources in the initial public offering pursuant to a Registration Statement and Prospectus. *See* Affidavit of R. Randall Roche, attached as Exhibit "A" to Plaintiffs' Reply (Document No. 117). In addition, there is uncontroverted evidence that at no time did MPERS purchase "any shares of Reliant Resources, Inc. from a short seller" nor did "MPERS lend any shares of Reliant Resources, Inc. to any third party to enable such party to sell those shares short." Id. at ¶¶ 3, 4. Because MPERS acquired Reliant Resources stock in an initial public offering pursuant to a challenged registration statement and prospectus, MPERS has standing to assert claims under Sections 11 and 15 and, accordingly, there is no Article III standing impediment to certifying the class.

**B.    Certification Requirements under Rule 23**

Whether a class should be certified depends on whether the requirements of Rule 23(a) and (b) are met. Amchem Products, Inc. v. Windsor, 117 S.Ct. 2231, 2245 (1997).

10

### 1.   Rule 23(a) Requirements

The requirements of Rule 23(a), generally referred to as numerosity, commonality, typicality and adequacy of representation, *see* <u>Amchem</u>, 117 S.Ct. at 2245, are apparent from the allegations in the Consolidated Class Action Complaint and were admitted by Defendants in oral argument.

First, although Plaintiffs have not identified the number of class members, approximately 60 million nationally traded shares are at issue.  In addition, Plaintiffs estimate that there are "thousands of geographically dispersed members of the Class." Memorandum in Support of Motion for Class Certification (Document No. 108) at 7.  Given the number of nationally traded shares at issue, an assumption of numerosity arises. *See* <u>Zeidman v. J. Ray McDermott & Co., Inc.</u>, 651 F.2d 1030, 1039 (5th Cir. 1981) ("the prerequisite expressed in Rule 23(a)(1) [of numerosity] is generally assumed to have been met in class action suits involving nationally traded securities"); <u>Lehocky v. Tidel Technologies, Inc.</u>, 220 F.R.D. 491, 499 (S.D. Tex. 2004) (finding numerosity requirement based on number of overall shareholders and fact that the stock was nationally traded on the NASDAQ); <u>In re HealthSouth Corp. Sec. Litig.</u>, 213 F.R.D. 447, 457 (N.D. Ala. 2003) (numerosity requirement found based on the common sense assumption that 395 million outstanding shares of stock would have been "purchased or acquired by 'many persons and entities' during the purported class

period"). Based on that unchallenged assumption, as well as Plaintiffs' reasonable estimate that the absent class members will number in the thousands, the numerosity requirement has been met. *See e.g.*, Lehocky, 220 F.R.D. at 499; In re Safeguard Scientifics, 216 F.R.D. 577, 580 (E.D. Pa. 2003) (finding numerosity requirement met in a securities fraud case based on the "millions" of shares that were publicly traded during the class period); Bovee v. Coopers & Lybrand, 216 F.R.D. 596, 608 (S.D. Ohio 2003) (same); HealthSouth, 213 F.R.D. at 457 (same).

Second, Plaintiffs have identified both common questions of law *and* common questions of fact. "The test for commonality is not demanding and is met 'where there is at least one issue, the resolution of which will affect all or a significant number of the putative class members.'" Mullen v. Treasure Chest Casino, L.L.C., 186 F.3d 620, 625 (5th Cir. 1999) (quoting Lightbourn v. County of El Paso, 118 F.3d 421, 426 (5th Cir.1997)), *cert. denied*, 120 S.Ct. 1169 (2000); *see also* James v. City of Dallas, 254 F.3d 551, 570 (5th Cir. 2001), *cert. denied*, 122 S.Ct. 919 (2002). Where "the plaintiffs' claims arise from the same alleged course of conduct and are based on legal theories similar to those of all the class members," the commonality requirement is met. In re Deutche Telekom AG Sec. Litig., 229 F. Supp. 2d 277, 281 (S.D.N.Y. 2002). Given that Section 11 claims are premised on a material misstatement or omission in a registration statement, the

12

commonality requirement is easily met. <u>In re Computer Memories Sec. Litig.</u>, 111 F.R.D. 675, 687 (N.D. Ca. 1986) ("The primary issue under section 11 will be whether the offering materials contained material misrepresentations or omissions"); <u>Levitan v. McCoy</u>, 2003 WL 1720047 at *4 (N.D. Ill. 2003) ("In Section 11 cases, typically the only individual issue is a calculation of the damages which each individual class member suffered."). Here, in addition to the common question of whether the Registration Statement and Prospectus contained a material misrepresentation or omission, there are common questions as to whether the market price of Reliant Resources stock was inflated, and whether Defendants are liable under Section 11. Therefore, the commonality requirement has also been met. *See e.g.,* <u>Levitan</u>, 2003 WL 1720047 at *4; <u>HealthSouth</u>, 213 F.R.D. at 458; <u>Maywalt v. Parker & Parsley Petroleum Co.</u>, 147 F.R.D. 51, 55 (S.D.N.Y. 1993) (where Plaintiffs alleged "a common course of conduct by the Defendants in issuing the original Prospectus/Proxy Statement, which allegedly contained material misrepresentations and omitted material facts" the commonality requirement was met).

Third, the claims of MPERS are typical of the claims of the class. In order to meet the typicality requirement, the claims of the class representative must be "typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). "Like commonality, the test for typicality is not demanding. It 'focuses on the

similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent.'" Mullen, 186 F.3d at 625 (quoting Lightbourn, 118 F.3d at 426)). "Typicality exists when the claims of named and unnamed plaintiffs have a common source and rest upon the same legal and remedial theories." Lehocky, 220 F.R.D. at 500. Here, the claims of MPERS, the proposed class representative, are premised on the same events, conduct and legal theories as the claims of the proposed class. In addition, no one has asserted that there are any defenses to MPERS' Section 11 and Section 15 claims that are atypical or unique. Id. ("class certification is not appropriate where a class representative is subject to unique defenses that threaten to become the focus of the litigation"). As such, the typicality requirement has also been met.

Fourth, MPERS, can fairly and adequately protect the interests of the class as a whole. "Rule 23(a)'s adequacy requirement encompasses class representatives, their counsel, and the relationship between the two." Berger, 257 F.3d at 479. Adequacy of representation under Rule 23(a)(3) depends on "'[1] the zeal and competence of the representative[s'] counsel and . . . [2] the willingness and ability of the representative[s] to take an active role in and control the litigation and to protect the interests of absentees[.]'" Id. (quoting Horton v. Goose Creek Indep. Sch. Dist., 690 F.2d 470, 484 (5th Cir. 1982)). Thus, inquiry must be

14

made into the interests of the class representative, and the competency of counsel. Here, the competency of counsel is not an issue. MPERS' counsel has substantial experience with class action securities cases. *See* Orders entered August 29, 2002 (Document No. 26) and November 29, 2002 (Document No. 45); *see also* Modell v. Eliot Savings Bank, 139 F.R.D. 17, 23 (D. Mass. 1991) (making note of the experience and competency of the law firm Berman DeValerio Pease Tabacco Burt & Pucillo); Olson v. Energy North, Inc., 1999 WL 1332362 at *5 (Mass. Super. Jan. 14, 1999) (same). MPERS's interests are the same as the interests of the class members, with no antagonistic interests being alleged or demonstrated by any party. In addition, the fact that MPERS is an institutional investor, with significant amounts at stake in this litigation and sufficient skill and resources vigorously to pursue its claims, further supports the adequacy of MPERS as class representative. *See* City Partnership Co. v. Jones Intercable, Inc., 213 F.R.D. 576, 585-86 (D. Colo. 2002) (noting the benefits of an institutional investor as class representative). Therefore, the adequacy of representation requirement has been met.

Upon this record, all requirements of Rule 23(a) are met.

### 2.    Rule 23(b)(3) Requirements

Defendants' entire argument under Rule 23(b)(3) in opposition to class certification is premised on the claimed effect that short

15

sales will have on composition of the proposed class and the argument that individual statutory standing issues will arise and predominate over common issues.[6]    Defendants summarize their argument against class certification as follows:

> In this case, two important factors demonstrate that Plaintiffs lack the ability to prove standing with respect to many members of the proposed class.    First,

---

[6] "Short Selling" is explained by both sides in their briefing. It has also been described by the Third Circuit in <u>Zlotnick v. TIE Communications & L.W.</u>, 836 F.2d 818 (1988) as follows:

> Where the traditional investor seeks to profit by trading a stock the value of which he expects to rise, the short seller seeks to profit by trading stocks which he expects to decline in value.    A typical short seller expects decline because, based on his view of the underlying strengths and weaknesses of a business, he concludes that the market overvalues the business' stock. . . .

> Short selling is accomplished by selling stock which the investor does not yet own; normally this is done by borrowing shares from a broker at an agreed upon fee or rate of interest.    At this point the investor's commitment to the buyer of the stock is complete; the buyer has his shares and the short seller his purchase price.    The short seller is obligated, however, to buy an equivalent number of shares in order to return the borrowed shares.    In theory, the short seller makes this covering purchase using the funds he received from selling the borrowed stock.    Herein lies the short seller's potential for profit: if the price of the stock declines after the short sale, he does not need all the funds to make his covering purchase; the short seller then pockets the difference.    On the other hand, there is no limit to the short seller's potential loss: if the price of the stock rises, so too does the short seller's loss, and since there is no cap to a stock's price, there is no limitation on the short seller's risk.    There is no time limit on this obligation to cover.

<u>Zlotnick</u>, 836 F.2d at 820.

16

> Plaintiffs cannot demonstrate that the "shares" underlying many of the class members' Section 11 claims were issued pursuant to (and are thus traceable to) the registration statement Plaintiffs allege to be defective. Second, because Plaintiffs cannot show that these class members' claims are based on the ownership of real (rather than artificial) shares, they cannot prove that they hold "securities," as that term is defined in the Securities Act of 1933.

Reliant Defendants' Opposition to Plaintiffs' Motion for Class Certification (Document No. 113) at 13. In oral argument Defendants identified the holder of the "artificial shares" as the person who purchased shares and held them in street name at a brokerage firm, and whose shares were then borrowed by the brokerage firm without identifying the owner of these shares in order to facilitate another customer's consummation of a short sale of such shares. Thus, according to Defendants, the purchaser who became an unwitting "lender" of shares held in a long position is rendered the holder of "artificial shares," for which that purchaser cannot recover damages under Section 11 of the Securities Act. Additionally, Defendants argue, it is virtually--if not absolutely--impossible to determine who owns the "real shares" and who holds the "artificial shares" because most shares are held in street name by brokerage companies which, in turn, deposit the shares in a single fungible mass in the Depository Trust Company. Hence, attempting to sort out which purchasers of Reliant Resources hold "real shares" and which hold "artificial shares" will lead to complex individual issues of statutory standing that will

17

predominate over common issues.  Defendants set forth the detailed rationale of their novel argument as follows:

> Where a brokerage customer's stock is borrowed by a short seller, there arises a difficulty in determining what type of beneficial interest, and therefore which rights, the lending customer retains with respect to shares that he lends.  Some of these difficulties are resolved by a contract known as the Master Securities Loan Agreement, which sets forth certain obligations of the stock lender and the short seller.  Parsons Decl. ¶ 16.  Among other things, the contract specifies that, during the loan period, the lender of the loaned stock has the right to any dividends or distributions with respect to the stock but *waives* any right to vote the stock during the loan period.  *Id.*
>
> . . . . When one investor lends a share that another investor later purchases from a short seller, both of these persons, the lender and the subsequent purchaser, cannot "own" the same share of stock at the same time.  Parsons Decl. ¶ 8.  Instead, because each investor (the lender and the subsequent purchaser) asserts a beneficial interest attributable to a *single* share of stock, only one of these investors can truly "own" the share.  The other investor merely owns a beneficial interest that comes about as a result of the short sale transaction itself.  *Id.* at ¶ 10.  Because this beneficial interest does not represent an actual ownership of stock, it can be classified as an "artificial share."  *Id.*
>
> Not surprisingly, where there is a significant short interest in a given stock, there will also be a significant number of claims to beneficial ownership of stock that are based on artificial-rather than real-shares.
>
> \* \* \*
>
> In an ideal world, the difficulties posed by the competing claims to stock ownership that arise in connection with short sale transactions might be resolved by contractual provisions that would require an investor lending his share to relinquish all ownership rights arising from that share-other than the right to receive dividends, which are typically paid by the short seller.

18

This "ideal" solution might have worked 35 years ago. . . .

[Today, however,] [a]lmost all stock is now held in "street name," meaning that an intermediary (such as a brokerage firm), and not the investor, is the nominal owner of the shares, while the investor is the beneficial owner of those shares. Parsons Decl. ¶¶ 18, 20. In most cases, the DTC [Depository Trust Company], which is owned by several hundred brokerage firms, serves as the central depository for the securities that are beneficially owned by a participating brokerage firm's individual customers. *Id.* ¶¶ 18, 19. The DTC does not keep records documenting the ownership of shares on a customer-by-customer level, but instead regards the participant brokerage firms as the nominal owners of all of their customers' securities. *Id.* ¶ 20. It thus falls upon the participating brokerage firm to keep track of the shares beneficially owned by each of its customers. *Id.*

The participating brokerage firms, in turn, place all of their customers' securities into a single fungible mass, which is held as a commingled bulk fund at the DTC. Parsons Decl. ¶ 23. Although the brokerage firms record the identity of the investors whose securities are held in street name, there is no way of associating any *particular* share with a particular investor. *Id.* ¶ 24. . . .

\* \* \*

As a consequence of the street name system, when a brokerage firm lends a customer's share to a short seller, it is always impossible to know *which* investor was the "lender" of that share or, for that matter, which particular share was loaned to begin with. Parsons Decl. ¶ 24. Because it is impossible to identify which investor loaned a given share of stock, or, indeed, which particular investor purchased the loaned share, it is impossible to resolve the conflict arising between the two by determining which of the two investors holds a real–as opposed to an artificial–share. *Id.* ¶ 26

In fact, the monthly brokerage account statements that investors in Reliant Resources received would show both the lender and the subsequent purchaser as an owner of a share of Reliant Resources stock. *Id.* ¶ 24. This means that Reliant Resources will be faced with damage claims

19

from investors holding "real" shares and those holding artificial shares, and there is no simple way to distinguish one from the other. Consequently, Reliant Resources will be faced with multiple, *i.e.*, millions, of claims for damages stemming from shares that it never issued.

Reliant Defendants' Opposition to Plaintiffs' Motion for Class certification (Document No. 113) at pp. 6-10 (emphasis in original).

Defendants' exact argument--that short selling creates "artificial shares," that owners of "artificial shares" do not have standing to bring suit, and that distinguishing owners of "artificial shares" from other members of the class would create overwhelming individualized questions--was recently rejected by one of the Federal judiciary's luminaries, Senior United States District Judge Robert E. Keeton, in In re PolyMedica Corp. Sec. Litig., 224 F.R.D. 27, 44-45 (D. Mass. 2004). In PolyMedica, the defendants argued that "those proposed class members who had 'artificial shares' will need to be distinguished from those who did not" and "that this process will create overwhelming individualized questions." Id. at 45. Judge Keeton wrote that the "Defendants' contention is wholly without merit." Id. He explained that the argument was "premised on an inaccurate concept of standing for securities fraud cases" and that the proposed class members who had "artificial shares" were nonetheless purchasers of

20

"securities" within the meaning of the securities fraud statutes.

Id.  He wrote:

> Standing in a securities fraud case such as this one is limited simply to "purchasers or sellers of securities." *In re Oxford Health Plans, Inc. Secs. Litig.*, 199 F.R.D. 119, 122 (S.D.N.Y.2001).  The goal in this limitation is to prevent litigation by "bystanders, who, having risked nothing, would claim that they would have bought or sold securities but for the fraud."  *Haber v. Kobrin*, No. 82 Civ. 3715, 1983 WL 1332, at \*3 (S.D.N.Y. June 3, 1983). Those proposed class members who had "artificial shares" were nevertheless purchasers in the strictest sense of the word.  They are not, in any way, the "bystanders" that should be excluded from bringing suit.  Standing in a securities fraud case is not contingent on the rights a person has in a security.  In fact, it has been held that an entity that entered into a contract for securities had standing to sue as a "purchaser" even though the other party to the contract never had the securities to transfer.  *See First Nat'l Bank of Chicago v. Shearson Lehman Brothers, Inc.*, No. 85 C 4266, 1989 WL 165009, at \*5 (N.D.Ill. Dec. 20, 1989).
>
> Accordingly, no separation of proposed class members will be necessary and individual questions of fact do not arise.

PolyMedica, 224 F.R.D. at 45.

Indeed, standing to pursue a Section 11 claim is based on "acquiring such security" that is traceable to a challenged registration statement.  15 U.S.C. § 77k; Azurix, 332 F.3d at 873. A "security" is broadly defined by the Securities Act of 1933 as:

> any note, stock, treasury stock, security future, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided

21

interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

15 U.S.C. § 77b. In addition, the Supreme Court has noted that the statutory definition of "security" was intended "to encompass virtually any instrument that might be sold as an investment," and that the securities laws were designed to "regulate investments, in whatever form they are made and by whatever name they are called." Securities and Exchange Commission v. Edwards, 124 S.Ct. 892, 896 (2004) (quoting Reves v. Ernst & Young, 110 S.Ct. 945, 949 (1990)).

Defendants' argument is that one may have "acquired" for full purchase price Reliant Resources common shares on or shortly after the day the registration statement was issued, and thus hold a long position in street name at the purchaser's brokerage firm, but be left without right or remedy under Section 11 of the Securities Act if his brokerage firm lent his shares--without a debit to his account--to another customer who consummated a short sale with the anonymously borrowed shares. Defendants deem the original purchaser who lawfully "acquir[ed] such security," see Section 11, as now bereft of "real" shares and left only with "artificial

22

shares," untraceable to the registration statement. This is not what the statute provides and no court has so held. It is the fact that one was a *purchaser* of the security that gives him standing under Section 11. PolyMedica, 224 F.R.D. at 45.

As Defendants point out, the practices of most securities being held in street name and brokerage firms depositing their shares in the fungible mass of the Depository Trust Company dates back to a generation ago. Short sales of securities have been made throughout these 30 years or so and, as Defendants' counsel conceded in oral argument, Defendants anticipated an after market following their registration and were not surprised by short sales of the securities issued. In this sense, this case involves no unexpected phenomenon but just the commonplace series of events that occur in nearly every IPO and its aftermath. When Defendants issued Reliant Resources common shares pursuant to a registration statement, they issued those shares into a marketplace, complete with short sales, with which they were thoroughly familiar. There is nothing about the short sales in Reliant Resources shares that has been shown to raise major individual issues that would predominate over issues common to the class.

In sum, the Court is not persuaded by Defendants' theory that real purchasers of real shares traceable to the registration statement are unwittingly rendered mere holders of artificial shares for which they have no recourse under the Securities Act,

23

and that sorting out who are holders of "artificial shares" will raise individual questions that predominate over the major common issues in this case.  To the contrary, the Court finds that the major issues in this case, as in most Section 11 cases, include whether material misrepresentations and/or omissions were made in the registration statement, whether the market price for Reliant Resources's stock was artificially inflated, and whether Defendants are liable for violations of Section 11 and Section 15.  As those issues are common to all members of the proposed class and predominate over any individual issues that have been plausibly shown to be present, the predominance requirement in Rule 23(b)(3) is met.  See Carpe, 224 F.R.D. at 458; In re Worldcom, Inc. Sec. Litig., 219 F.R.D. 267, 293-297 (S.D.N.Y. 2003) (predominant issues on a claim under Section 11, despite arguments regarding individual reliance issues, included whether the challenged registration statement "contained material, untrue statements and omissions).

Finally, a class action is a superior method for resolving the parties' controversy given the nature of the remaining claims, the individual amounts subject to recovery if a class action were not certified, the desirability of concentrating the claims in one forum, and the difficulties, which counsel are well able to manage, of maintaining this case as a class action.[7]  As succinctly put by

---

[7] The matters to be considered in connection with the superiority requirement include: "(A) the interest of members of the class in individually controlling the prosecution or defense of

24

the District Court in the Southern District of New York, in the absence of a class wide adjudication of certain securities fraud claims, the claims would never be heard. <u>Worldcom</u>, 219 F.R.D. at 304 ("Few individuals could even contemplate proceeding with this litigation in any context other than through their participation in a class action, given the expense and burden that such litigation would entail.").

Because the requirements of Rule 23(a) are met, and because common questions will predominate over individual questions, and because a class action in this case is superior to the other available methods for the adjudication of Plaintiffs' Section 11 and Section 15 claims, Lead Plaintiffs' Motion for Class Certification (Document No. 103) will be granted.

## V.   Conclusion and Order

Based on the foregoing, it is

ORDERED that Lead Plaintiffs' Motion for Class Certification (Document No. 107) is GRANTED, and the Court CERTIFIES Lead Plaintiffs' proposed class of all persons or entities who purchased common shares of Reliant Resources in the Initial Public Offering

---

separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action." FED. R. CIV. P. 23(b)(3).

on April 30, 2001, or traceable thereto, pursuant to the Reliant Resources Registration Statement and Prospectus dated April 30, 2001, for the period from April 30, 2001, through May 14, 2002, and who suffered injury in the form of losses from such purchases, with exclusions from the class as specified by Lead Plaintiffs in their motion.  It is further

ORDERED that within twenty-one (21) days after the entry of this Order, the parties shall submit for the Court's consideration an agreed, appropriate Notice to the class that comports with the requirements of Fed. R. Civ. P. 23(c).

The Clerk shall notify all parties and provide them with a true copy of this Order.

SIGNED at Houston, Texas, on this 18TH day of February, 2005.

EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE